1            UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF MISSOURI
2                  WESTERN DIVISION

3

   UNITED STATES OF AMERICA,    )  Case No. 4:09-CR-00163-HFS
4                               )
              Plaintiff,        )
5                               )
   VS.                          )
6                               )
   TERRY R. INGERSON,           )
7                               )  September 17, 2009
              Defendant.        )  Kansas City, Missouri
8

9          *****************************************

10              TRANSCRIPT OF SUPPRESSION HEARING
                  BEFORE JOHN T. MAUGHMER
11             UNITED STATES MAGISTRATE JUDGE

12         *****************************************

13

   APPEARANCES:

14

   For United States:      Mary Elizabeth Phillips
15                          Assistant U.S. Attorney
                            400 E. 9th Street
16                          Room 5510
                            Kansas City, MO  64106
17
   For Defendant:          Matthew J. O'Connor
18                          O' Connor Law Firm
                            523 Grand
19                          Suite 1B
                            Kansas City, MO  64106
20
   [Defendant present.]

21

22                   Regina A. McBride, RDR, CRR
                       Official Court Reporter
23                  400 East 9th Street, Room 8652
                       Kansas City, MO  64106
24                        816.512.5623

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

1          (Begin proceedings in open court at 10:21 a.m.)

2          THE COURT:  Calling this morning Criminal Action

3   09-163-01-CRW-HF -- excuse me, HFS, *United States of America*

4   *vs. Terry R. Ingerson*.

5          May I first please have the entry of appearance of

6   counsel for the United States?

7          MS. PHILLIPS:  Beth Phillips on behalf of the United

8   States.

9          THE COURT:  Thank you, Ms. Phillips.  And for

10  Mr. Ingerson?

11         MR. O'CONNOR:  Matthew J. O'Connor on behalf of

12  Mr. Ingerson.  And also appearing with me is my law clerk,

13  Brian Wolford, if that's all right with the Court?

14         THE COURT:  That's fine.

15         MR. O'CONNOR:  Okay.

16         THE COURT:  Thank you, Mr. O'Connor.

17         Mr. Ingerson, I would note that you have a set of

18  head phones on to assist your hearing.  Can you hear me okay?

19         THE DEFENDANT:  Yes.

20         THE COURT:  All right.  If you have any difficulty,

21  why let Mr. O'Connor know and we'll do our best to address

22  that.

23         THE DEFENDANT:  Okay.

24         THE COURT:  Calling this matter today for the

25  purpose of a -- of an evidentiary hearing with respect to the

1   motion to suppress evidence filed by the defendant.

2           Ms. Phillips, are you ready to proceed for the

3   United States?

4           MS. PHILLIPS:  I am, Your Honor.

5           THE COURT:  Very well.

6           MS. PHILLIPS:  I would call Jim Kanatzar to the

7   stand.

8           THE COURT:  Sir, would you please come forward to be

9   sworn?

10  SPECIAL AGENT JAMES D. KANATZAR, GOVERNMENT WITNESS, SWORN

11          THE COURT:  Please have a seat, if you would, sir.

12  If you would please state your name and spell your last name

13  for the record.

14          THE WITNESS:  It's James D. Kanatzar.  Last name is

15  spelled K-A-N-A-T-Z-A-R.

16                      DIRECT EXAMINATION

17  BY MS. PHILLIPS:

18  Q.  Mr. Kanatzar, where are you employed?

19  A.  I'm employed with Immigration Custom Enforcement.

20  Q.  What is your position with Immigration Custom Enforcement?

21  A.  I'm a special agent.  Senior special agent.  Sorry.

22  Q.  Is Immigration Custom Enforcement commonly referred to as

23  ICE?

24  A.  Yes.

25  Q.  How long have you been with ICE?

1    A.   Well, I've been a federal agent over 20 years.

2    Q.   And what are your current responsibilities as -- as a

3    special agent with ICE?

4    A.   Assigned to the national security group.  I do -- part of

5    my collateral duties I do the computer forensics for the

6    office.  And most of my investigations have been child

7    pornography-related investigations.

8    Q.   Approximately how many child pornography investigations

9    have you been involved in during your career as a federal law

10   enforcement officer?

11   A.   Well over a hundred.

12   Q.   And how many search warrant executions have you been

13   involved in during that same time period?

14   A.   As a case agent I also assisted other agents over -- well

15   over 70 federal search warrants.

16   Q.   And approximately how many times have you been involved in

17   the questioning of suspects in connection with child

18   pornography investigations?

19   A.   I'd say over a hundred times.

20   Q.   At some point, during your career with ICE, did you become

21   involved in the investigation of Terry Ingerson?

22   A.   Yes.

23   Q.   As part of that investigation did you execute a search

24   warrant on Ingerson's home?

25   A.   Yes.

1  Q.  Can you tell the Court the address of his home?

2  A.  It's -- it's also just slipped out of my head.  406

3  Francis Street, Polo, Missouri.

4  Q.  It's in Polo, Missouri?

5  A.  Let me check.

6  Q.  And if at any point you need to --

7  A.  It's 401 Francis Street.  Excuse me.  I said 406.  It's

8  401 Francis Street, Polo, Missouri.

9  Q.  And you have reports in front of you from the execution of

10  the search warrant?

11  A.  Yes.

12  Q.  If at any point you need to refer to those reports to

13  refresh your recollection, please do so.

14  A.  Okay.

15  Q.  Can you generally explain to the Court what the search

16  warrant permitted you to search Ingerson's home for?

17  A.  We were searching for evidence of child pornography.

18  Q.  When did you execute that search warrant?

19  A.  On March 20th.

20  Q.  And what date -- what year?

21  A.  Of 2009.

22  Q.  What day of the week was March 20th, 2009?

23  A.  That was a Friday.

24  Q.  What time did you arrive at Ingerson's home?

25  A.  About 9:00 a.m.

1   Q.  When you arrived at the home, who was present?

2   A.  The wife and three juvenile children.

3   Q.  When you say the wife, Mr. Ingerson's wife?

4   A.  Yes.

5   Q.  Were you surprised to see the juveniles there?

6   A.  Yes.

7   Q.  And why was that?

8   A.  Well, that was a school day.  I didn't know if there was

9   going to be any juveniles there, any children there.  But I

10   thought if -- if he did have children that they would be in

11   school.

12   Q.  Did you ascertain why the juveniles were at home on that

13   Friday morning?

14   A.  That was their spring break.

15   Q.  And what did you do when you first arrived at the home?

16   A.  Well, the wife answered the door, and once we made entry I

17   talked with the wife and explained to her why we were at the

18   residence and gave her a copy of the search warrant.

19   Q.  And did you -- what did you say to the wife about staying

20   in the residence, leaving the residence, things of that

21   nature?

22   A.  Well, I told her, you know, that we were there to execute

23   a search warrant for child pornography, and she was not under

24   arrest, and she could leave the residence if she needed to go

25   somewhere.

1  Q.  Did you also offer the opportunity to stay at the

2  residence?

3  A.  Yes.

4  Q.  And what did she choose to do?

5  A.  She chose to stay.

6  Q.  As you were executing the search warrant, where were the

7  juveniles located in the home?

8  A.  They were brought down into the living room of the

9  residence.  And I did the interview of her in the dining room

10 of the residence.

11 Q.  Is the living room of the residence on the first floor of

12 the residence?

13 A.  Yes.

14 Q.  Is the dining room of the residence on the first floor?

15 A.  Yes.  The first floor.  Yes.

16 Q.  How many agents were with you as you executed the warrant?

17 A.  Including myself, there were seven of us.

18 Q.  And did one -- so you interviewed -- initially you

19 interviewed the wife?

20 A.  Yes.

21 Q.  And what were the other agents doing as you were

22 interviewing the wife?

23 A.  Gina and Jessie spoke with the children.  And then the

24 other agents were doing the search of the residence.

25 Q.  So Gina and Jessie are two other ICE agents?

1    A.  Yes.

2    Q.  And when you say they spoke with the children, did they

3    interview the children?

4    A.  No.  They were just saying, you know, how they like

5    school, just small talk to put the kids -- the children at

6    ease.

7    Q.  And so two of the agents remained with the children in the

8    living room?

9    A.  Yes.

10   Q.  At some point did Ingerson arrive home?

11   A.  Yes.

12   Q.  Approximately what time did he arrive to the residence?

13   A.  About 9:50 a.m.

14   Q.  And where did you first meet Ingerson?

15   A.  I had -- Jessie, at that time, was kind of watching to see

16   if he -- when he arrived, and he reported the car just pulled

17   up.  We watched him get out of the car, and then as he was

18   coming through the gate, myself and Jessie exited the house

19   and -- and walked out and met him out in the yard of the -- of

20   the residence.

21   Q.  Now, is Jessie referred to in the reports as Agent Stoker?

22   A.  Yes.

23   Q.  I am going to show you two exhibits.  Government's Exhibit

24   1 and 2, and ask if you recognize these photos?

25   A.  Yes.

1  Q.  What are those -- what is Government's Exhibit Number 1 a

2  photo of?

3  A.  This is the back side of the -- the residence.  I took

4  this photo.  I did a drive-by in early March, and this photo

5  was taken at that -- during my drive-by.

6  Q.  And what is Exhibit Number 2 a photo of?

7  A.  Again, the back of the house, looking straight at the

8  house.  This was taken the day of the search warrant.

9  Q.  And are these photos fair and accurate representations of

10  the back of Ingerson's home on the date that you executed the

11  search warrant March 20th of 2009?

12  A.  Yes.

13        MS. PHILLIPS:  I move to admit Government's Exhibits

14  1 and 2.

15        MR. O'CONNOR:  No objection.

16        THE COURT:  One and Two admitted.

17    (Government Exhibits 1 and 2 admitted in evidence.)

18  Q.  So I think you previously testified that you met the

19  defendant as he was approaching the house?

20  A.  Yes.

21  Q.  And do those exhibits reflect where you first met with the

22  defendant as he was approaching the house?

23  A.  Yes.  He'd come to the wooden gate here, and he was on the

24  inside of the fence when I approached him.

25  Q.  So inside of the wooden gate that's surrounding the home?

1    A.  Yes.

2    Q.  And when you first approached him, was Agent Stoker with

3    you?

4    A.  Yes.

5    Q.  What were you wearing?

6    A.  I was wearing blue jeans, probably tennis shoes, probably

7    a long sleeve polo T-shirt type, and I had a -- my bulletproof

8    vest on.

9    Q.  And what was Agent Stoker wearing?

10   A.  I believe he was in blue jeans as well and had his vest on

11   as well.

12   Q.  Did either of your vests indicate that you were members of

13   law enforcement?

14   A.  Mine didn't.  I didn't have any markings on my vest.

15   Jessie had "ICE" and "Police" on his vest.

16   Q.  So although neither of you were wearing uniforms, at least

17   one of you had a -- a bulletproof vest which indicated that

18   you were law enforcement officers?

19   A.  Yes.

20   Q.  Were you carrying weapons?

21   A.  Yes.  I had my service revolver on my hip, I did not have

22   it in my hand.  It was -- it was holstered, and then I had --

23   next to my holster I have a badge, a belt badge that I wear

24   next to my holster.

25   Q.  As you initially approached Ingerson, did you draw your

1  weapon?

2  A.  No.

3  Q.  Did you even have your hand on your weapon?

4  A.  No.

5  Q.  Can you tell the Court what you first said to the -- to

6  the defendant when you approached him as he was coming through

7  the gate of the fence that surrounds his home?

8  A.  I met him -- I introduced myself to him.  I told him I was

9  at the residence executing a federal search warrant for child

10  pornography, and I proceeded to tell him that he was not under

11  arrest, and that he was free to leave.  If he had some other

12  place to go, he was free to go.

13  Q.  Did you provide Ingerson a copy of the warrant?

14  A.  Yes, I did.

15  Q.  After explaining to him that he was not under arrest and

16  that he was free to leave, what did you do next?

17  A.  I asked him if he'd be willing to answer some questions,

18  how his name came up in a child porn investigation.

19  Q.  And what was Ingerson's response?

20  A.  He said, "Sure."

21  Q.  Did he express any hesitation to you when he indicated he

22  was willing to speak to you?

23      MR. O'CONNOR:  Objection.  Calls for speculation.

24      THE COURT:  Overruled.

25  A.  No hesitation.

1  Q.  Now, before speaking with Ingerson on the steps, did he

2  enter his home?

3  A.  No.

4  Q.  Did he have any opportunity to see within the home and see

5  how many agents were inside his home?

6  A.  No.

7  Q.  Did he have any opportunity to see inside the home to see

8  what the agents inside his home were doing?

9  A.  No.

10  Q.  So after Ingerson states that he is willing to speak with

11  you and Agent Stoker, can you explain to the Court where on

12  the Exhibits 1 and 2, you, the defendant and Agent Stoker were

13  standing?

14  A.  On Exhibit 2, after we started the -- you know, after he

15  agreed to talk to me, I -- I sat on the top step of the -- to

16  the -- where the entry of the door.  So I was sitting on the

17  top step.  He was to the -- Ingerson was to the right of me

18  and Jessie was to the left of me, standing.  Both of them were

19  standing.  I sat on the step.

20  Q.  So is it fair to say that the entry to the house there in

21  those exhibits has two concrete steps?

22  A.  You said two concrete steps?  There was two or three steps

23  I think to the residence there.

24  Q.  Into the residence?

25  A.  Uh-huh.

1    Q.   And so were you sitting at the top step, is that your

2    testimony?

3    A.   Yes.

4    Q.   And were you facing towards the door or towards the -- the

5    fence?

6    A.   I was facing out towards the fence.

7    Q.   And when you say that Agent Stoker and the defendant were

8    to each side of you, were they on the steps or were they on

9    the ground?

10   A.   On the ground.

11   Q.   As you were sitting on the steps, was the defendant to

12   your right or to your left?

13   A.   He was to my right.

14   Q.   And then as a result, Agent Stoker must have been to your

15   left?

16   A.   Yes.

17   Q.   Approximately how far was the defendant from you as you

18   were sitting on the steps and the defendant was to your right?

19   A.   Probably four or five feet.  I mean, I could reach about

20   three feet.  I couldn't touch him.  So he was probably just

21   outside my reach, maybe four -- four to five feet.

22   Q.   And how far was Agent Stoker -- Stoker from the defendant

23   as you were speaking with the defendant?

24   A.   Probably a good four or five feet as well.

25   Q.   Now, as you were speaking -- well, how long did you speak

1    with the defendant as you were outside sitting on the steps of

2    his home?

3    A.   Probably about 15, 20 minutes.

4    Q.   At any point during this conversation with the defendant,

5    was the defendant free to -- to move about?

6    A.   Yes.

7    Q.   Did you restrain him in any way?

8    A.   No.

9    Q.   If asked, would you have let the defendant into the

10   residence?

11   A.   Yes, I would.

12           MR. O'CONNOR:  Objection, Your Honor.  It's

13   irrelevant if he was at -- that's a hypothetical.  He wasn't

14   asked if he -- he never did ask.

15           THE COURT:  Yeah.  The witness has already answered

16   the question.  I'll consider the objection with the testimony.

17           MR. O'CONNOR:  Thank you, Judge.

18   Q.   Now, when you were speaking with the defendant outside of

19   his home, did you use any deceptive tactics when speaking with

20   him?

21   A.   No.

22   Q.   And who conducted the most -- the majority of the

23   interview, you or Agent Stoker?

24   A.   I did.

25   Q.   Can you give the Court just a very brief overview of the

1   information the defendant provided you while -- while you were

2   outside sitting on the steps of his home?

3   A.   Yeah.   I asked him his name, his date of birth, his Social

4   Security number, asked him how long he lived at the residence,

5   asked him how long he was married, asked him where he worked,

6   what his work hours were.   I asked him if he owned a computer,

7   asked him how long he owned the computer, asked him his user

8   name for the computer and password for the computer, asked him

9   who else used the computer, asked him if he bought any

10  memberships to any porn sites, and also asked him to see his

11  credit card, if he owned any credit card.   He said he owned

12  one.   I asked to see that credit card.   He pulled it out of

13  his billfold, handed it to me.   I asked him if he had any

14  disputed charges on that credit card.   He said there was one

15  charge that's -- and it was a $2,000 charge in New York.

16          I asked him if he ever bought any child porn sites,

17  membership to any child porn sites, and he initially said no.

18  And then, you know, I then tell him that, you know, we knew

19  that his credit card was used to buy a membership to a site in

20  April.   And I showed him the information, user name and

21  password that was used to access that site.   He said the user

22  name was a name he had used from playing cards as Mr. Trump.

23          He said he played on-line card games and that was

24  from his on-line card game playing Mr. Trump.   And the

25  password is trico1.   He said that was the password he had used

1    at Ford Motor Company.  The credit card used, he agreed that

2    was his credit card.  The address that the -- that the bill

3    went to for the person at the website was a P.O. Box.  He said

4    that was his P.O. Box that he used and owned.  Then I asked

5    him if he bought membership to that site, and he at first he

6    didn't believe he did.  And then I said, well, you know, we

7    had captured that website and there was log files showing that

8    he had accessed his user name and IP address, had accessed

9    that site.  And then he said, well, you know, he must have

10   done it then, or he was kind of evasive in his answers to me.

11   Q.  At some point after you had the conversation that you

12   briefly summarized for us, did you move the conversation

13   inside the home?

14   A.  Yes.

15   Q.  And can you just real briefly tell us why it was that you

16   moved the conversation inside the home?

17   A.  Well, at one point Agent Raggs had asked, interrupted my

18   interview with him and wanted to show me something.  And so I

19   went inside the house for two to three minutes -- I mean,

20   two -- I mean, three to five minutes, tops.  Went upstairs and

21   showed me a CD disc that was found in -- in the master bedroom

22   dresser drawer in -- under some men's underwear or boxers.

23   And there was also a -- a printout sheet for membership to a

24   Gentle Angels was with the website was in there with the CD.

25   And then I asked a few questions how far the search was

1    proceeding and stuff, and went back outside to talk with

2    Ingerson again.

3    Q.  So when you went inside did you learn that there was a

4    bedroom upstairs that had been searched and was open and

5    available?

6    A.  Yes.

7    Q.  And so at some point, then, did you ask the defendant if

8    he wanted to go inside?

9    A.  Yes.

10   Q.  And why did you ask him if he wanted to go inside?

11   A.  Because it was windy outside and it was cool, and I asked

12   if we could move the interview inside.

13   Q.  What was the defendant's response when you asked if he

14   wanted to go inside to continue the interview?

15   A.  He was agreeable.

16   Q.  Why, then, did you go upstairs to continue the interview

17   rather than interviewing the defendant in the downstairs

18   address?

19   A.  Well, because I had the children in the living room and

20   the wife was in the dining room, and the nature of the

21   questions that I wanted to ask, you know, I didn't want to

22   embarrass him in front of his kids and his wife.

23   Q.  Was there any place that you could have gone downstairs in

24   the home that the conversation between you and the defendant

25   would not have been heard?

1  A.  Not that I'm aware.

2  Q.  And so can you describe, then, the bedroom upstairs that

3  you ultimately went upstairs to with the defendant and Agent

4  Stoker?

5  A.  It was a bedroom at the opposite end of the hall from the

6  master bedroom.  It had a double bunk bed and it had a single

7  bed when you first come in the door.  There was two wooden

8  dresser drawers on one wall.  On the opposite wall there was

9  another wooden dresser drawer.  And it appeared to be the --

10  the daughter's bedroom.

11  Q.  I'm going to show you what we've marked as Government's

12  Exhibit Number 3 and ask if you recognize this photo?

13        MR. O'CONNOR:  Judge, we'll agree to the admission

14  of Exhibit 3 is the bedroom of the daughter in this action.

15        MS. PHILLIPS:  Thank you.  I move to admit Exhibit

16  Number 3.

17        THE COURT:  Three admitted.

18     (Government Exhibit 3 admitted in evidence.)

19  Q.  Can you briefly explain to the Court what we're looking at

20  in Exhibit Number 3?  For example, where is the door to the

21  bedroom in relationship to what's being shown in that photo?

22  A.  Yeah.  He had a pretty expensive -- I mean, a high

23  resolution camera.  And it was pretty close up, because it's

24  to the right.  At the foot of the bed, it would be on your

25  right-hand side is where the entry door, and then what you

1   can't see on this photo on the left-hand side it would be a

2   double bunk bed.  There's kind of like tubing type things.

3   Instead of a wooden bunk bed it's a tube -- tubular double

4   bunk bed.

5   Q.  So does this photo represent the area of the bedroom where

6   you, Agent Stoker and the defendant remained as you continued

7   your interview with the defendant?

8   A.  Yes.

9   Q.  Can you explain to the Court where each of the three of

10  you were standing or sitting, if that's the case, as the

11  conversation continued?

12  A.  All three of us would have been standing pretty close to

13  the -- the -- the wooden dresser drawers in front of the --

14  the bunk bed -- or the bunk bed and the -- the -- her -- her

15  single bed here.

16  Q.  Did all three of you stand during the entire interview?

17  A.  I believe so.

18  Q.  And do you recall essentially in what order the three of

19  you were standing?

20  A.  I was standing back against the wall, I think he was

21  standing looking at me on the -- kind of the right-hand side.

22  I think Jessie might have been more in behind him, back next

23  to the bunk bed.

24  Q.  So when you say you were standing along the wall, is that

25  the wall closest to the bed that's represented in Government

1  Exhibit Number 3?

2  A.  I was standing closer to the dresser drawers here.

3  Q.  The dresser drawers.  And when you say he was standing

4  facing you, is that the defendant?

5  A.  Yes.

6  Q.  At any time during your continued conversation with the

7  defendant in the bedroom, did you shut the bedroom door?

8  A.  No.

9  Q.  At any time during your conversation with the defendant,

10  were either you or Agent Stoker standing between the defendant

11  and the door of the bedroom?

12  A.  No.

13  Q.  At any point during your conversation with the defendant

14  in the bedroom, did you restrain the defendant or prevent him

15  from leaving the bedroom?

16  A.  No.

17  Q.  Had he asked you to leave the bedroom would you have

18  permitted him to do so?

19  A.  He -- he would have -- I would have allowed him to go to

20  an area that had been previously searched, yes.

21  Q.  Approximately how long were you upstairs with the

22  defendant?

23  A.  I think we -- I asked him a few more questions.  It was

24  probably within another ten, fifteen to twenty minutes again.

25  Ten or fifteen minutes maybe.

1 Q.  Do you specifically recall any new information that you

2 got from the defendant during your conversation in the bedroom

3 that you hadn't already received in your conversation outside

4 the home?

5 A.  Well, I asked him about the CD that was found, you know,

6 what was on the CD, if he -- if it was his CD.  He said he

7 didn't know what was on there.  He -- I asked him if it was

8 his CD.  He said he didn't know.  You know, I told him it was

9 found in his dresser drawer in the master bedroom under his

10 underwear.  And I asked him about the Gentle Angels printout,

11 if that was a child porn site.  He said he didn't know.

12        And then I asked him what was his definition of

13 child porn.  He told me it was anywhere -- of anyone under age

14 of 18 and they would have to be engaged in sexual activity to

15 be child porn.  A child just posing would not be child porn in

16 his -- this his own eyes.

17        And I asked him what time he used the computer.  He

18 said when he got home he used -- got home -- he usually got

19 home about a quarter 'til 10:00 and he'd get on the computer

20 until about noon, about twelve o'clock, and then he usually

21 went to bed between one to two o'clock.

22 Q.  And this is one to two o'clock in the afternoon?

23 A.  Yes.

24 Q.  After concluding your interview with the defendant

25 upstairs, what did you and Agent Stoker do?

1  A.  The agents had finished with the master bedroom and so

2  everybody was moved downstairs, and so we went downstairs.

3  Q.  What did the defendant do?

4  A.  He chose to sit on the -- the steps leading up to the

5  second floor.  He's on the up -- the top step.  He sat there

6  while the kids were in the living room and the wife was in the

7  dining room.

8  Q.  About how -- approximately how much longer did you remain

9  at the residence after you concluded your conversation with

10  the defendant upstairs?

11  A.  Probably about another 20 minutes, trying to get

12  everything boxed up and inventory completed.

13  Q.  At the end of the search of the residence did you arrest

14  the defendant?

15  A.  No.

16  Q.  Did you, among other things, seize a computer from the

17  residence?

18  A.  Yes.

19  Q.  Did you at some point after the search then use forensic

20  software to look at the contents of the hard drive of that

21  computer?

22  A.  Yes.  I took the computer back to my office, and then I

23  did a -- a mirrored image using Encase to make a bit by bit

24  copy of the entire contents of the computer hard drive.

25  Q.  And Encase is a forensic software?

1  A.  Yes.

2  Q.  When did you mirror the hard drive and use forensic

3  software to look at the contents of the hard drive?

4  A.  That would have been on Tuesday, the 24th of March.

5  Q.  I think you earlier testified that during your

6  conversation with the defendant outside his residence, you

7  obtained his password and log-in to the computer; is that

8  right?

9  A.  That's correct.

10  Q.  Did you use the information you obtained from the

11  defendant regarding his log-in and password in order to access

12  the information contained on the computer that you reviewed on

13  March 24th?

14  A.  No, I did not.

15  Q.  Can you explain to the Court why it is that you didn't

16  need the log-in and password that you obtained from the

17  defendant in order to forensically examine the computer?

18  A.  Because Encase, like I said, is a byte -- bit by bit copy.

19  His screen name -- his Windows log-in name and password hasn't

20  encrypt the hard drive, so it isn't -- has no bearing on me

21  copying the contents of the hard drive.

22  Q.  So if, for example, the defendant had chosen to not speak

23  with you or not give you his log-in and password, would you

24  have still have been able to access the contents of the hard

25  drive using the forensic software?

1    A.  Yes.

2    Q.  Can you real briefly tell the Court what you initially

3    found on the hard drive when you looked at it on March 24th of

4    this year?

5    A.  After I had image mirrored I conducted a brief examination

6    of the -- of the hard drive contents, and I saw a number of

7    images, child pornography images and movies.  And I had went

8    into a folder called WOW and I saw a movie of a young girl,

9    you know, of the individual setting up the camera.  You could

10   see the -- the badge and some -- or credentialed -- or I want

11   to say ID badge and some keys and wearing coveralls had set up

12   a camera to the left of the room, and probably about four or

13   five minutes later a young girl comes in with a towel around

14   her body, and a towel on her head start dressing for -- she

15   drops the towel and puts her underwear on.  And -- and as the

16   movie was playing, I -- what picked my interest up is I

17   recognized the room that had --

18   Q.  How -- how was it that you recognized the room that the

19   video was being filmed in?

20   A.  Well, I did the interview of Mr. Ingerson in the bedroom,

21   and what I noticed was the red wall, how it was painted, and

22   you could clearly see that in the video, so.

23   Q.  And so when you say the red wall, and you're gesturing,

24   are you pointing to Government's Exhibit Number 3?

25   A.  Yes.

1  Q.  Did you recognize the juvenile in the video that was

2  changing from her towel into clothing?

3  A.  I had -- when I stumbled across the video, Jessie Stoker

4  and Gina were still at the office.  This was late on Tuesday

5  afternoon.  It was almost like five o'clock or after when I

6  stumbled across the video.  I showed them the video, and they

7  both recognized the -- the -- the female in the -- as being

8  the daughter -- stepdaughter.

9  Q.  And Gina and Agent Stoker, were those two of the agents

10  who were in the living room with the children as the warrant

11  was being executed?

12  A.  Yes.

13  Q.  As a result of the videos that you discovered on the hard

14  drive, what was the next step that you took in the

15  investigation of this case?

16  A.  I applied for a second search warrant.

17  Q.  When did you obtain that search warrant?

18  A.  On the 25th.

19  Q.  25th of March?

20  A.  Yes.

21  Q.  What time was the search warrant signed by the magistrate

22  on the 25th?

23  A.  11:00 a.m.

24  Q.  What did you do after the search warrant was signed?

25  A.  I contacted my office.  Jessie, my acting supervisor at

1  the time, contacted him and let him know that it was signed,

2  and then we tried to get a search team rounded up and we

3  briefed -- and we, you know, tried to get everybody, let them

4  eat and then brief, and then we drove immediately from the

5  briefing to the residence.  I think we stopped -- there was a

6  parking lot off of 35.  I can't remember what the highway it

7  goes to Polo, but there was a commuter parking lot and we

8  stopped there, and a couple agents got in -- instead of

9  everybody driving separately we kind of two to a car.

10  Q.  So what time did you arrive at the defendant's residence

11  to execute the second search warrant?

12  A.  About 2:20 p.m.

13  Q.  When you arrived at the residence who was the first person

14  you came in contact with?

15  A.  The wife.

16  Q.  What did you tell Mr. Ingerson's wife?

17  A.  That we were there for -- to execute a second search

18  warrant for -- looking for cameras and stuff.

19  Q.  Did Mr. Ingerson's wife tell you where Mr. Ingerson was?

20  A.  He was upstairs.

21  Q.  Did she tell you what he was doing?

22  A.  He was in bed.

23  Q.  What did you do after learning that Mr. Ingerson was

24  upstairs in bed?

25  A.  We immediately went up and went right to his room and --

1 and got him out of bed.

2 Q. Why did you go upstairs and wake him yourself rather than

3 permitting Mrs. Ingerson to go up and wake him?

4 A. When we did the search warrant the first time there was a

5 rifle in the bedroom.

6 Q. After waking the defendant, what did you do next?

7 A. Like I said, we woke him up. I handed him a pair of pants

8 to put on. We -- he got out of bed. We went into the

9 daughter's bedroom, the same as pictured as Exhibit 3 here. I

10 told him why we were at the residence. I told him that we had

11 found two videos of his stepdaughter. They were filmed of her

12 nude, and that I had a search warrant to seize all the

13 cameras, digital cameras at the residence to find the camera

14 that was used to record that video.

15 Q. When you say we, who was in the room -- in the room, the

16 stepdaughter's room being -- as you were explaining to the

17 defendant why you were there?

18 A. Jessie Stoker.

19 Q. So there were three of you?

20 A. Yes.

21 Q. After you explained to him why you were back in the

22 residence, what did you do next?

23 A. Then I had Jessie Stoker Mirandize him.

24 Q. And can -- how was it that Agent Stoker went about

25 Mirandizing him? From memory? From a card? Did he --

1  A.  He pulled out a card, Miranda card, and read from the

2  card.

3  Q.  Is -- how -- was the card that he used a ICE card?

4  A.  Yes.  I have a copy of it.

5  Q.  And are you familiar with that card through your work with

6  ICE?

7  A.  Yes.

8  Q.  Can you read to the Court what Agent Stoker read to the

9  defendant after you explained to him why you were back at the

10  residence?

11  A.  Okay.  You have the right to remain silent.  Anything you

12  say can be used against you in court.  You have the right to

13  consult with an attorney and have them present during

14  questioning.  If you cannot afford an attorney, one will be

15  appointed to represent you prior to any questions.  Do you

16  understand your rights?  Are you willing to waive these rights

17  and talk to me?

18  Q.  After Agent Stoker asked the defendant if he understood

19  those rights, what was the defendant's response?

20  A.  Yes.

21  Q.  After Agent Stoker asked the defendant if he was willing

22  to talk with Agent Stoker, what was the defendant's response?

23  A.  Yes, he was willing to talk to us.

24  Q.  While being read his rights and responding to Agent

25  Stoker's questions, how did the defendant appear as far as

1    mentally and understanding what was going on?

2    A.   He -- he understood what was going on.  After we read his

3    rights, and I asked him, you know, what camera was used, and

4    he immediately described the camera to me.  He said it was a

5    camera he had bought off of Amazon.com.  He said he paid $35

6    for it.  He said with the -- gave me the location where it was

7    located at.  It was downstairs next where the computer was.

8    He told me where the computer was located, because we seized

9    it, you know, a couple days -- on Friday before.  And then he

10   proceeded to say that he bought the camera.  His intent when

11   he bought the camera was film a canoeing and family camping

12   trip and he didn't intend to film the daughter with it.

13   Q.   Now, this information that you just provided, or that you

14   just outlined, did the defendant provide that to you in

15   response to individual questions that you asked him?

16   A.   I just asked him, you know, where was the camera that was

17   used to record the video, and he provided that information.

18   Q.   And then did you then follow-up with additional questions?

19   A.   Yes.

20   Q.   And what specifically, if you recall, what were the

21   additional questions that you asked him?

22   A.   I asked him if he's the one that did the filming, and he

23   said, yes, he did the one time.  And I said, well, there's two

24   videos that I'd seen on the computer.  And he said he only did

25   it one time.  And I said, well, there's two videos.

1    Q.  Okay.  Let me back you up just -- just a minute so we can

2    cover the initial portion of the conversation.  When you asked

3    him where the camera -- which camera was used, he responded to

4    your question, right?

5    A.  Yes.

6    Q.  Did you follow-up with any additional questions regarding

7    the camera?  Did you ask him, for example, where he bought it?

8    A.  No.  He -- he volunteered that information.

9    Q.  Did you ask him what credit card he used or did he

10   volunteer that information?

11   A.  He volunteered that information.  He bought it with his

12   credit card.

13   Q.  Did he ask you -- did you ask him why he bought the camera

14   or did he volunteer that information?

15   A.  He volunteered that information.

16   Q.  So you then -- and during this portion of the

17   conversation, did he appear to be confused?

18   A.  No.

19           MR. O'CONNOR:  Objection.  Calls for speculation.

20           THE COURT:  Overruled.  Asked for the witness'

21   perception of the defendant's appearance.

22   Q.  At this point in the conversation did he appear to not

23   understand either of your questions or indicate to you that he

24   didn't understand your questions?

25           MR. O'CONNOR:  Objection, calls for opinion beyond

1    this witness' capability in terms of either a medical or

2    psychological as to whether Mr. Ingerson understood.

3              THE COURT:  Overruled.

4    A.  He did -- he appeared to understand my questions, yes.

5    Q.  And so then at some point did you ask him about the videos

6    that you found on the computer?

7    A.  Yes.

8    Q.  And what was his response when you asked him about the

9    videos?

10   A.  He said he only did it one time.

11   Q.  And then what was your -- did you follow-up with any

12   additional questions or statements?

13   A.  Yes.  I told him there was two videos that I had observed,

14   and there may be more.  That I had observed at least two

15   separate videos that were on his computer.  I asked him, you

16   know, if he did the second one, and he said no.  He don't --

17   he said he didn't remember a second video.

18   Q.  And so at any point during your interview did Mr. Ingerson

19   agree with your statement that the -- agree with your

20   evidence, at least, that he filmed the juvenile on two

21   different occasions?

22   A.  It went back and forth a little bit on that.  He kept

23   saying, I only can remember the one time.  I don't remember a

24   second time.  I don't remember a second time.  And then I

25   don't know if he ever agreed to the second time.  I don't

1   think he did.

2   Q.  Now, at some point did you learn that -- did the defendant

3   share with you that he had taken a -- some type of medication

4   prior to going to bed?

5   A.  Yes, he did.

6   Q.  Do you recall what he told you about the medication?

7   A.  I think he named the medication he took.  I don't know

8   where -- what -- what that medication was.  I asked him if he

9   understood what was going on, and he said he did.

10  Q.  But you asked him that question after you learned that he

11  was taking medication?

12  A.  Yes.

13  Q.  As a result of your search and your conversation with the

14  defendant, did you seize some cameras from the home?

15  A.  Yes.

16  Q.  Approximately how many cameras did you seize, do you

17  recall?

18  A.  Well, the camera that was used is called an Oregon

19  Scientific.  It was like a little round tubular camera.  And

20  then there was like I believe six or seven digital like a

21  Kodak, and it was just -- I can't remember the brands of the

22  cameras.  About six cameras.  I think it was seven cameras

23  totally seized from the residence.

24  Q.  Do you still have the Oregon Scientific camera in your

25  custody today?

1   A.  Yes.

2   Q.  Do you have the other six cameras in your custody today?

3   A.  No.

4   Q.  And why is that?

5   A.  I returned those cameras to the wife.

6   Q.  Why did you return the cameras to the wife?

7   A.  They were the children's cameras.  I previewed them and

8   eliminated them as the cameras that did not record the videos.

9   Q.  And so did the wife contact you and ask you for those

10  cameras back?

11  A.  Yes.

12  Q.  And why did she want those cameras back?

13  A.  Well, the kids are -- prom was coming up, and I think the

14  oldest daughter wanted her camera to take pictures and stuff.

15  Q.  And so you returned the cameras that were not involved in

16  the crime back to the wife and children?

17  A.  Yes.

18          MS. PHILLIPS:  I don't have any other questions.

19          THE COURT:  Cross examination, Mr. O'Connor?

20          MR. O'CONNOR:  Thank you, Your Honor.

21                      CROSS EXAMINATION

22  BY MR. O'CONNOR:

23  Q.  Mr. Kanatzar, you've been in law enforcement how many

24  years?

25  A.  Twenty years.

1    Q.  And you've participated in the execution of over 70 search

2    warrants; is that right?

3    A.  Child porn search warrants, yeah.

4    Q.  Okay.  And how many search warrants other than child porn

5    have you participated in?

6    A.  Quite a few.  The first seven years of my career I did

7    drug investigations, and I probably had 20 or 30 search

8    warrants for drugs.  I've done IPR violation cases, and --

9    Q.  Probably over 200, just as a ballpark?  Several times,

10   maybe 20 a year?

11   A.  I don't think that many, no.

12   Q.  Okay.

13   A.  Total amount?

14   Q.  Yes.

15   A.  I don't know.  Maybe a hundred and fifty.

16   Q.  A hundred and fifty.  And each time, primary concern

17   before executing the search warrant is officer safety, is it

18   not?

19   A.  Yes.

20   Q.  And then secondary to that would be preservation of

21   evidence that the search warrant is seeking; is that correct?

22   A.  Yes.

23   Q.  And as a result of the concern for officer safety and for

24   the preservation of evidence, it is protocol to have a

25   briefing beforehand; is that not correct?

1    A.  Yes.

2    Q.  And as part of that briefing do you determine the location

3    as being about to be searched, you tell the other officers

4    involved about the location?

5    A.  Yes.

6    Q.  And you share with them information about the location in

7    terms of who would be present in the home?

8    A.  That -- yes.

9    Q.  Yes.

10   A.  I expect.

11   Q.  And in order to make sure people are present in the home,

12   the reason you do that is for determining how many agents are

13   going to be responsible for attending the residence of the

14   home so that the search can continue and also eliminate

15   anyone's access to potential weapons; is that correct?

16   A.  Yes.

17   Q.  And you did that in this case, did you not?

18   A.  Yes.  We had a briefing, yes.

19   Q.  You had a briefing before both times that there was an

20   encounter, both on the 20th and the 25th; is that correct?

21   A.  That's correct.

22   Q.  And was there any -- without revealing any trade secrets,

23   so to speak, there was information that you had about

24   Mr. Ingerson prior to arriving at the home; is that correct?

25   A.  Yeah.  I did some background checks on Mr. Ingerson, yes.

1    Q.  Yes.  And you knew that he had children?

2    A.  I didn't know how many.

3    Q.  Okay.  You knew there were children in the home?

4    A.  There potentially could have been children, yes.

5    Q.  Okay.  You didn't go check?

6    A.  What's that?

7    Q.  You didn't go check previously?

8    A.  No.

9    Q.  Prior to executing the search warrant you didn't eyeball

10   the property, observe the property, see if there's any --

11   A.  Well, I did.  I did a couple drive-bys, yes.

12   Q.  Okay.  All right.  And also prior to arriving on the 20th,

13   you had other information which provided the foundation for

14   your search; is that correct?

15   A.  Yes.

16   Q.  And that included information from a website which had

17   been subjected to a different federal investigation; is that

18   correct?

19   A.  Yes.

20   Q.  And that's what led you to Mr. Ingerson, is it not, credit

21   card numbers?

22   A.  Yeah.

23   Q.  Okay.  And that wasn't for his wife, it was for him,

24   correct?

25   A.  It was -- the credit card used was in his name.

1  Q.  Okay.  Were in his name?

2  A.  Yes.

3  Q.  And I noted that when you explained how your contact with

4  Ms. Ingerson, his wife, that you indicated that she chose to

5  stay, you gave her a choice?  You said, "You can stay or

6  leave"?

7  A.  Yes.

8  Q.  And you offered that same choice to Mr. Ingerson?

9  A.  Yes.

10  Q.  You did?

11  A.  Yes.

12  Q.  You verbally said to him, "You can stay or you can leave"?

13  A.  Yes.

14  Q.  And is that memorialized in your reports?

15  A.  Yes.  On the first interview, yes.

16  Q.  Okay.  And do you notice -- are you able to observe

17  Mr. Ingerson well from where you're seated right now on the

18  witness stand?  He's at counsel table?

19  A.  Yes.

20  Q.  And does he look any different to you than he did on March

21  20th?

22  A.  Oh, yeah.

23  Q.  And how is that?

24  A.  He was -- had just got off work on March 20th, so he was

25  wearing coveralls with the little -- his Ford motor ID badge

1    on his left pocket.  And there were --

2    Q.  Other than his clothing, does he look any different to

3    you, his physical appearance?

4    A.  About the same.

5    Q.  Okay.  Was he wearing any hearing-assisted device such as

6    he is today?

7    A.  No.

8    Q.  Did you ask him whether he could hear you or whether he

9    had any issues related to his hearing?

10   A.  No, I did not.

11   Q.  Okay.  Did you ask him where he had been previously prior

12   to arriving at the house?  And this was nine o'clock or so; is

13   that right?

14   A.  9 -- 9:50.

15   Q.  Okay.  Did you ask him where he had been?

16   A.  He had just come from work.  The wife had told me he was

17   at work, so.

18   Q.  Okay.

19   A.  And he worked -- the wife told me he had worked the night

20   shift.  He goes in about midnight and gets home about a

21   quarter to 10:00 every day.

22   Q.  And the -- you indicated that you had on a bulletproof

23   vest; is that correct?

24   A.  Yes.

25   Q.  Again, that's for your own safety, understandably?

1    A.   Uh-huh.

2    Q.   And is that a yes?

3    A.   Yes.

4    Q.   And was it Officer Stoker, am I pronouncing that

5    correctly?

6    A.   Yeah.  Jessie Stoker, yes.

7    Q.   He had on a bulletproof vest and also with big white

8    letters, ICE, police things of that nature?

9    A.   Yes.

10   Q.   How many agents were there total that were armed at the

11   residence on March 20th?

12   A.   Well, all seven of us would have been armed.

13   Q.   Okay.  And what weapon were you carrying?

14   A.   What weapons?

15   Q.   Yeah.  What's your -- what's your issue?  What's your

16   issue service revolver?

17   A.   Sig 40.

18   Q.   And did you have that on your side arm?  Did you have it

19   in your holster?

20   A.   The reason I'm kind of hesitating here, we had just

21   switched weapons.  I mean, we're -- currently we're carrying

22   Sig 40.  I used to carrying a Glock 9 millimeter.  And I'm

23   just kind of thinking, when did we -- we switched sometime, I

24   don't know if it was -- I think it was after.  I might have

25   had a 9 millimeter.

1  Q.  Okay.  Any of the other officers have an automatic rifle,

2  an AR?

3  A.  No.

4  Q.  Okay.  What type --

5  A.  No shotguns either.

6  Q.  No shotguns either?

7  A.  No.

8  Q.  Any -- was there devices that would have aided entry, if

9  necessary?  In other words, if no one was home, what was the

10  plan?

11  A.  I usually try to find an open window, or I re -- I do not

12  like kicking in a door or anything like that.  I've done

13  search warrants where I've actually crawled through a window,

14  open window to gain entry.

15  Q.  Okay.

16  A.  So we did not carry up with us a -- any battering ram or

17  anything like that.

18  Q.  And by the time that Mr. Ingerson arrived, you'd been at

19  the home how long?

20  A.  About 50 minutes.

21  Q.  And at that point the interview of his wife and then --

22  and also the other people in the house that all already sort

23  of started and you started questioning them?

24  A.  I was pretty much completed with the interview of the wife

25  and was just basically waiting for him to arrive at the

1  residence and also have the agents, you know, complete their

2  search.

3  Q.  And do they -- the focus that led you to Mr. Ingerson was

4  the credit card bills and then also you were able to see the

5  other credit card purchases.  And was it your opinion at that

6  point reviewing them and then your application for the first

7  search warrant that you were actually starting to focus on

8  Mr. Ingerson and needed to verify some information?

9  A.  Was I focusing in on Ingerson?

10 Q.  Yes.

11 A.  Anybody could have used a credit card.  So, you know, it

12 could have been the wife, it could have been anybody, you

13 know, that had access to his credit cards.  So I didn't know.

14 Q.  So you needed to determine that information before you

15 completed your investigation; is that correct?

16 A.  Yes.

17 Q.  And included in that information you wanted to ask him

18 about passwords and computer use; is that right?  This was

19 something you'd want to know?

20 A.  Sometimes I ask that question and sometimes I don't.

21 Q.  In terms of if there's -- how many people in the house had

22 access to the computer?  When I say "access" or at an age that

23 a reasonable person would believe they could log on and use

24 the computer?  Three or four?

25 A.  Well, he said all three children.

1    Q.   Okay.

2    A.   And I think he had -- and then his wife.  So it would have

3    been four.

4    Q.   Okay.  And then the password becomes important because

5    whether or not you're able to actually access the computer

6    through the RFL and the forensic lab that you have, the

7    password becomes important for what reason?

8    A.   The password becomes important, other people using the

9    computer would not have access to his files.

10   Q.   Okay.  And that's the question that you asked him during

11   the first interview or the second interview?

12   A.   The first interview.

13   Q.   Okay.  And when you first encountered Mr. Ingerson, Agent

14   Stoker was standing near, within a few feet from the steps; is

15   that correct?

16   A.   Yes.

17   Q.   As depicted in Exhibits 1 and 2; is that right?

18   A.   Yes.

19   Q.   And did you have your Miranda card or did Mr. Stoker have

20   his Miranda card which you referred to when discussing the

21   second encounter on March 25th?  Did you have that available

22   on March 20th?

23   A.   Yes, we did.

24   Q.   What was the reason you chose not to Mirandize

25   Mr. Ingerson on March 20th?

1  A.  You know, just asked him general questions.  And again,

2  you know, anybody could have used that card to actually buy

3  access to the child porn from the residence there.

4  Q.  And general questions including his password name -- or

5  his user name, his password, things of that nature?  Is that

6  general questions on how you're characterizing that?

7  A.  Yes.

8  Q.  Okay.  And did you -- general question is his definition

9  of child pornography?

10  A.  What's that?

11  Q.  One of the other general -- what you're referring to, that

12  you only gave him general questions.  But these general

13  questions included asking him what he thought his definition

14  of child pornography?

15  A.  I started out general questions, and more specifically

16  started asking him questions.

17  Q.  And you -- the questions became specific after you started

18  to determine that he was likely the person that you were

19  looking for who accessed this unlawful child pornography site

20  which had been shut down by a previous investigation, correct?

21  A.  Yes.

22  Q.  Okay.  And I also noted that -- and correct me if I'm

23  wrong -- during the first and/or second encounter,

24  Ms. Phillips asked if he asked to leave, which he never did

25  ask to leave, did he?

1    A.   No, he never did.

2    Q.   That you would have allowed him to go into a different

3    room that had been searched?  That was your answer, was it

4    not?

5    A.   On that -- on the first encounter, yes.

6    Q.   Okay.

7    A.   Didn't want him to destroy evidence or anything, so you

8    had to preserve -- like I said, preserve evidence.

9    Q.   Right.  Or access a weapon and harm himself or someone

10   else, right?  Those are good reasons for not want him to do

11   that?

12   A.   Yes.

13   Q.   Not want him to go into a room that hasn't been searched,

14   correct?

15   A.   That's correct.

16   Q.   But I noted you didn't say he could go outside or leave?

17   A.   If he wanted to leave he was free to leave.

18   Q.   But he never did ask to leave?

19   A.   But he never did ask.

20   Q.   And you never did tell him he could leave?

21   A.   Yes, I did.  When I encountered him at the fence I told

22   him why I was there, I was looking for child pornography.  He

23   was not under arrest and that he was free to leave.

24   Q.   Okay.  And you said it was windy outside was one of the

25   reasons you wanted to come inside?

1   A.  It was a little cool, yes.

2   Q.  Yeah.  And I believe in your -- and the record will

3   reflect that you may have also said it was kind of windy,

4   blustery March day.  I don't know if you said blustery, but I

5   believe you did say windy?

6   A.  Yes.

7   Q.  Okay.  And were you able to determine whether or not he

8   could hear you?

9   A.  He answered my questions that I asked.

10   Q.  And then sometimes he would answer your -- with

11   information about things you didn't ask; is that right?  Later

12   in the encounter you would ask him, you know, like whose

13   camera is this or where did you get the camera?  He would give

14   you a big long explanation?

15   A.  On the second interview, I mean, he -- you know, I asked

16   him where the camera was located, you know, and what camera

17   you used.  And he provided the answers.

18   Q.  Okay.  And this is going to sound like a funny question,

19   and I don't mean to be difficult.  Obviously you've never had

20   a federal search warrant served on you, have you not?

21   A.  No.

22   Q.  So it's not possible for you to say what that's like, what

23   a human being, any normal human being, whether it's

24   Mr. Ingerson or another, what they would experience being

25   informed that their house is being searched for child

1    pornography?  I mean, you've done this a lot in your capacity,

2    but you don't know what it's like being on the other end of

3    the fence, so to speak?  Do you understand that question?

4    A.  Yes.

5    Q.  Okay.  And during this encounter with Mr. Ingerson, he

6    told you what -- you learned what shift he worked at the Ford

7    plant; is that right?

8    A.  Yes.

9    Q.  And he indicated that -- also that he typically sleeps

10   from 1:00 to 9:00 p.m.  He told you that in the first

11   encounter?

12   A.  Yeah.  He went to bed usually between one to two o'clock

13   in the afternoon, slept until about nine, and then went to

14   work at about midnight.

15   Q.  And the information that you obtained from this first

16   encounter became part of the basis for the second search

17   warrant application; is that correct?

18   A.  Well, the videos that -- that were encountered on his

19   computer.

20   Q.  All right.  But do you utilize the information that you

21   obtained from the encounters on March 20th to support your

22   request for a search warrant that was executed on March 25th?

23   A.  True.  Yes.

24   Q.  Was there some reason you were not able to get the search

25   warrant either signed or prepared before the afternoon of

1   March 25th?  Was it --

2   A.  March 25th is the day we did the search warrant.

3   Q.  Was there a time that -- was there a reason you didn't do

4   it earlier in the day?

5   A.  Well, the judge is only available at eleven o'clock, I

6   mean.

7   Q.  Okay.

8   A.  I was at Ms. Phillips' office early that morning, and I

9   think that was the first available time the judge was

10  available at eleven o'clock.  If we could have got it sooner,

11  yes, we would have gotten it sooner.

12  Q.  And in preparation for either of the search warrants, did

13  you determine whether or not the children would be home?

14  A.  Say that again.  I didn't.

15  Q.  For the second search warrant, did you make any efforts to

16  determine whether the children would be present in the home?

17  A.  No.

18  Q.  And with regards to the first search warrant, you didn't

19  know -- you said you were surprised that they were home,

20  that's correct?

21  A.  Yes.

22  Q.  And you hadn't checked to see what the local school

23  district spring break was or their schedule or anything like

24  that?

25  A.  No.

1    Q.  And on the 25th you arrived at the Ingerson residence at

2    approximately 2:20 p.m.; is that correct?

3    A.  That's correct.

4    Q.  And Mr. Ingerson was sleeping when you arrived?

5    A.  He was in bed, yes.

6    Q.  And you rousted him from bed; is that correct?

7    A.  Yes.

8    Q.  Okay.  And did you take him to his stepdaughter's room?

9    A.  Yes.  That's where the interview was conducted.

10   Q.  And this was the second time you had taken him in the

11   stepdaughter's room, the first time being on March 20th; is

12   that correct?

13   A.  Yes.

14   Q.  And this is also the same room that's depicted in the

15   videotape which is one of the counts that's the subject matter

16   of this case; is that correct?  There's the videotape, and

17   that takes place in that room; is that right?

18   A.  Yes.

19   Q.  Did you choose that room based on that information?

20   A.  No.

21   Q.  And Mr. Ingerson informed you that he had taken Ambien, is

22   that right, a sleeping pill?

23   A.  He -- he told me what he took.  I -- I'm not sure what

24   it -- what it was.  But he did say he took some sleeping

25   medication, yes.

1    Q.  Have you ever had any personal knowledge as a law

2    enforcement officer working cases where Ambien is used

3    unlawfully by individuals to induce memory loss or other

4    cogni -- mental cognitive difficulties?

5    A.  No.

6    Q.  Have you been in any training where law enforcement

7    training or certification where you have been informed that

8    Ambien is often the new date rape drug, that mixed with

9    alcohol and other combinations it can cause memory loss and

10   blackout?

11   A.  No.

12   Q.  Okay.  You don't have any personal knowledge of anyone who

13   takes Ambien in terms of law enforcement who may have had

14   difficulty either remembering or not remembering details,

15   their cognitive function or anything like that?

16   A.  No.

17   Q.  Okay.  During the first encounter when Mr. Ingerson first

18   arrives at the residence about 9:50 a.m., correct?

19   A.  Yes.

20   Q.  You greet him at the steps of the residence and then

21   there's a discussion, correct?

22   A.  I greet him outside the residence, yes.

23   Q.  Right.  And there's a discussion on the steps and then you

24   and Agent Stoker then go with him as you go inside the house

25   to the bedroom; is that right?

1    A.  Yes.

2    Q.  And at any time are you more than ten feet away from him?

3    A.  At any time?  I don't think so, no.

4    Q.  Okay.  Did you do a patdown of him to make sure he

5    wasn't -- didn't have a weapon?

6    A.  No, I did not.

7    Q.  He was wearing baggy coveralls?

8    A.  He was wearing coveralls.  They were pretty tight on him.

9    Q.  Just a few more questions.  You indicated that you took

10   him into -- on the first encounter specifically, and correct

11   me if I'm mistaken on this, please, that you took Mr. Ingerson

12   into the stepdaughter's bedroom because you did not want to

13   embarrass him in front of his wife and kids; is that true?

14   A.  That's true.

15   Q.  The computer, the Dell computer which you seized at the

16   first search warrant, prior to taking the computer did you

17   have means to discover what the contents of that computer had

18   on its various disc drives, or do you have to have the actual

19   physical computer in order to do that?

20   A.  Are you asking if we could preview on site?

21   Q.  Or if you could preview through other means?  If you can

22   preview on site or preview through the internet?

23   A.  Not through the internet.

24   Q.  Okay.  On site?

25   A.  Through forensics equipment we could preview on site.

1    Q.  All right.

2            MR. O'CONNOR:  Just a moment.

3        (Mr. O'Connor conferred with the defendant off the record.)

4            MR. O'CONNOR:  Thank you, sir.  That's all the

5    questions I have.

6            THE COURT:  Redirect examination, Ms. Phillips?

7            MS. PHILLIPS:  I just have two areas that I want to

8    real briefly cover.

9                    REDIRECT EXAMINATION

10   BY MS. PHILLIPS:

11   Q.  With respect to this hearing issue, did the defendant ever

12   tell you during either of the interviews that he couldn't hear

13   you?

14   A.  No.

15   Q.  Did he ever ask you to repeat any of the questions?

16   A.  No.

17   Q.  And did he respond appropriately to your questions?

18   A.  He did.

19   Q.  Now, with respect to the preview of the computer, what do

20   you mean by -- what's your definition of preview?

21   A.  We have equipment.  I don't believe we took it out with us

22   at this search warrant.  But, I mean, we have equipment that

23   we can take out and have a write blocking device attached to

24   the hard drive.  We have to have access to the computer hard

25   drive, and then use Encase through a laptop and preview what

1    the contents on site.

2    Q.  And so when you preview the contents, are you able to

3    access all of the hard drive?

4    A.  Through Encase, yes.

5    Q.  Can you also -- and can you access, for example,

6    unallocated space?

7    A.  Yes.

8    Q.  The preview option essentially gives you a way to real

9    quickly look at the hard drive on site?

10   A.  Yes.

11   Q.  However, if you want to do a more in-depth analysis of the

12   hard drive, can you do that with the preview option of Encase?

13   A.  No.  I mean, you're limited on time.  That's -- you don't

14   know what you're going to encounter when you go to these

15   residences.  I mean, it could be a smaller -- in this case he

16   had a smaller hard drive in his computer.  But it's not

17   uncommon to go out and encounter a 1.5 terabyte hard drive,

18   which would be huge.  And you would be on site a long time

19   previewing and going through and trying to find what you're

20   looking for.

21   Q.  And does the preview option permit you to make a mirror

22   image or a identical image of the hard drive?

23   A.  With additional equipment you could mirror on site, yes.

24          MS. PHILLIPS:  I don't have any other questions.

25          THE COURT:  Recross examination, Mr. O'Connor?

1    MR. O'CONNOR:  No, Your Honor.  Thank you.

2    THE COURT:  Thank you, sir.  You may step down.

3    Ms. Phillips, any additional evidence, testimony or

4    proffers for the United States?

5    MS. PHILLIPS:  No, Your Honor.

6    THE COURT:  Mr. O'Connor, any evidence, testimony,

7    or proffers for Mr. Ingerson?

8    MR. O'CONNOR:  Your Honor, by way of introduction of

9    Exhibit Number 4, I will note for the record that I have

10   provided these previously to Ms. Phillips in anticipation of

11   streamlining and expediting today's hearing.  And Exhibit 4 we

12   move for admission, which is the medical records and a summary

13   from Mr. Ingerson's medical background.  And specifically, I

14   know there's a lot of material for the Court and also for

15   counsel.  And I believe Ms. Phillips has reviewed them in

16   their entirety.  And they focused in on the medications he was

17   on, and specifically the Ambien.  And certainly I think

18   Ms. Phillips may have an objection as to other issues, but to

19   their admission I believe she agrees.

20   THE COURT:  Any objection to Exhibit 4?

21   MS. PHILLIPS:  I -- just to clarify, I don't have an

22   objection to the foundation.  I will waive any objection to

23   any type of foundation.  These are business records.

24   I do object to their relevance.  I will stipulate to

25   the fact that the defendant had a prescription for Ambien

1   during March of 2009.  I think that the medical records

2   contains a lot of extraneous information that is irrelevant to

3   the purposes of this hearing.

4          But as far as foundation goes, I agree to that and

5   stipulate to the fact he had a prescription for the drug

6   Ambien.

7          THE COURT:  But you would acknowledge that at least

8   to the extent that the medical records reflect use of the drug

9   Ambien on the date in question, they're relevant to that

10  extent?

11         MS. PHILLIPS:  That's correct.

12         THE COURT:  All right.  I'll overrule the objection.

13  I think I can sort through what I think is relevant and not

14  and admit Exhibit 4.

15     (Defendant Exhibit 4 admitted in evidence.)

16         THE COURT:  Any additional evidence, testimony or

17  proffers, Mr. O'Connor?

18         MR. O'CONNOR:  No, Your Honor.  I think with this

19  information, and also the suggestions we filed, it's complete.

20         THE COURT:  Very well.  I will then consider the

21  record as being complete with respect to the defendant's

22  motion to suppress evidence and will take the matter under

23  advisement and will be issuing a report and recommendation.

24         Ms. Phillips, anything further for the United

25  States?

1          MS. PHILLIPS:  No, Your Honor.

2          THE COURT:  And Mr. O'Connor, anything further for

3    Mr. Ingerson this morning?

4          MR. O'CONNOR:  No, Your Honor.  Thank you.

5          THE COURT:  Very well.  We'll be in recess.

6       (Proceedings concluded at 11:34 a.m.)

7                  C E R T I F I C A T E

8       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

9    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

10

11   /s/Regina A. McBride, RDR, CRR   September 23, 2009
     REGINA A. MCBRIDE, RDR, CRR      DATE
12   Official Court Reporter

13

                      I N D E X
14
     WITNESSES:
15
     SPECIAL AGENT JAMES D. KANATZAR
16       Direct Examination by Ms. Phillips - Page 3
         Cross Examination by Mr. O'Connor - Page 33
17       Redirect Examination by Ms. Phillips - Page 51

18

19

     EXHIBITS ADMITTED:
20   Government Exhibit 1 - Photo of house - Page 9
     Government Exhibit 2 - Photo of house - Page 9
21   Government Exhibit 3 - Photo of bedroom - Page 18
     Defendant Exhibit 4 - Ingerson medical records - Page 54
22

23

24

     Reporter Certificate - Page 55
25