# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Criminal Action Number** |
| | ) | **09-00163-01-CR-W-HFS** |
| Terry Ingerson, | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE (Doc. #17) filed July 29, 2009 by defendant Terry Ingerson ("Ingerson"). On September 17, 2009, the undersigned held an evidentiary hearing on Ingerson's motion. Ingerson was present and represented by his counsel, Matthew J. O'Connor. The government was represented by Assistant United States Attorney Beth Phillips. At the evidentiary hearing, the government called one witness, Special Agent James D. Kanatzar with Immigration Custom Enforcement. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Gov't. #1 | Officer Leslie police report |
| Gov't. #2 | *Miranda* waiver form |
| Gov't. #3 | Detective Jenkins' police report |
| Def't #4 | Ingerson medical records |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

1. On March 20, 2009, James Kanatzar was employed as a Special Agent with Immigration Custom Enforcement ("ICE"). Tr. at 4-5.

2. During that time, ICE was investigating child pornography allegations related to Ingerson. Tr. at 4.

3. As part of that investigation, on Friday, March 20, 2009, Special Agent Kanatzar and six other ICE agents traveled to Ingerson's residence in Polo, Missouri to execute a search warrant search for evidence of child pornography. Tr. at 4-5, 7, 39.

4. Upon arriving at Ingerson's residence at approximately 9:00 a.m., the ICE agents ascertained that Ingerson's wife and three juvenile were home, but Ingerson was not present. Tr. at 5-6.

5. According to Ingerson's wife, Ingerson worked the night shift and did not usually get home until approximately 9:45 a.m. Tr. at 38.

6. Ingerson's wife was told that the ICE officers were there to execute a search warrant, that she was not under arrest, that she and the children could either stay or leave the residence while the search was conducted. Tr. at 6-7.

7. Ingerson's wife chose to stay and the children were thereafter placed in a living room in the company of two ICE agents, while Special Agent Kanatzar interviewed Ingerson's wife in a dining room. Tr. at 7, 37.

8. The remaining ICE agents then proceeded to search the residence. Tr. at 7-8.

9. At approximately 9:50 a.m., Ingerson arrived at the residence while the search was still proceeding. Tr. at 8.

10. Special Agent Kanatzar met Ingerson outside the house, introduced himself and told Ingerson that ICE was executing a federal search warrant. Tr. at 11.

11. Special Agent Kanatzar then told Ingerson that he was not under arrest and that he was free to leave. Tr. at 11, 37.

12. Special Agent Kanatzar then asked Ingerson if he was willing to answer some questions and Ingerson said "Sure." Tr. at 11.

13.  Subsequently, Special Agent Kanatzar sat down on the top step of the steps leading into Ingerson's house and spoke with Ingerson who was standing on the ground at the bottom of the steps.  Tr. at 12-13.

14.  Special Agent Kanatzar spoke with Ingerson outside the house for approximately 15-20 minutes.  Tr. at 14.

15.  After a time, Special Agent Kanatzar asked Ingerson if he wanted to go inside and Ingerson again agreed.  Tr. at 17.

16.  Because Ingerson's wife and children were still in the downstairs part of the house, Special Agent Kanatzar and Ingerson went upstairs to a bedroom to resume the interview.  Tr. at 17-18.

17.  Both Ingerson and Special Agent Kanatzar stood in the bedroom.  Tr. at 19-20.

18.  While in the bedroom, Ingerson told Special Agent Kanatzar that he usually got home from work at the local Ford plant at approximately 9:45 a.m., would then get on the computer until about noon, and then go to bed between 1:00 p.m. and 2:00 p.m.  Tr. at 21, 46.

19.  Special Agent Kanatzar then questioned Ingerson for another 10-15 minutes in the bedroom.  Tr. at 20.

20.  After the agents began searching in the upstairs of the house, Special Agent Kanatzar concluded the interview and Ingerson went downstairs and waited while the agents competed their search, which took another 20 minutes.  Tr. at 22.

21.  As a result of the search, several items were seized including a computer.  Tr. at 22.

22.  Apparent images of child pornography later were found on the computer's hard drive.  Tr. at 24.

23.  Special Agent Kanatzar recognized the setting for some of the images as having been filmed in the bedroom where he interviewed Ingerson, while other ICE agents recognized the minor depicted as being Ingerson's stepdaughter.  Tr. at 24-25.

24.  Based on the contents found on the hard drive, ICE applied for a second search warrant for Ingerson's house on March 25, 2009.  Tr. at 25-26.

25.  The second search warrant was then signed by the Magistrate Judge at approximately 11:00 a.m.  Tr. at 25.

26. ICE thereafter assembled a search team, briefed the team, and traveled to Ingerson's residence in Polo. Tr. at 26.

27. The search team (including Special Agent Kanatzar) arrived at Ingerson's residence at approximately 2:20 p.m. Tr. at 26.

28. The search team was met at the door by Ingerson's wife who told them that Ingerson was upstairs asleep. Tr. at 26.

29. Inasmuch as the ICE agent had observed weapons in Ingerson's home during the original search, the decision was made to have ICE agents go and awaken Ingerson. Tr. at 27.

30. Subsequently, Special Agent Kanatzar awakened Ingerson and told him that nude videos of his stepdaughter had been found on his computer hard drive and the agents had a second search warrant to seize all cameras and recording equipment. Tr. at 27.

31. At that point, ICE agents advised Ingerson of his rights under *Miranda*. Tr. at 27-28.

32. After advising Ingerson of his rights, the agents asked Ingerson if he understood his rights and he said that he did. Tr. at 28.

33. ICE agents then asked Ingerson if he was willing to talk with the agents and Ingerson said that he was willing to talk. Tr. at 28.

34. Ingerson answered the agents' questions and appeared to understand the questions. Tr. at 30-31.

35. At some point during the discussion, Ingerson told Special Agent Kanatzar that he had taken some medication [Ambien], but Ingerson again stated that he understood what was going on. Tr. at 32, 47-48.

36. As a result of the second search of Ingerson's residence, several cameras were seized. Tr. at 32.

**PROPOSED CONCLUSIONS OF LAW**

In his motion to suppress, Ingerson argues that: (1) law enforcement improperly questioned him on March 20, 2009, when he was interrogated without being apprised of his *Miranda* rights, and (2) any statements made by Ingerson on March 25, 2009 (when he was apprised of his *Miranda* rights) were not made with a knowing, intelligent, and voluntary waiver of Ingerson's rights.[1] For the reasons set out herein, the Court rejects both arguments.

The Fifth Amendment of the United States Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement that the [government] which proposes to convict and punish an individual produce the evidence against him by the independent labors of its officers, not by the simple, cruel expedient of forcing it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

---

[1] In addition, in his motion to suppress, Ingerson argues that the search of his residence on March 25, 2009, should be suppressed because it was merely the fruit of the improper interrogation on March 20, 2009. Inasmuch as the Court herein finds that the interrogation of Ingerson on March 20, 2009, was not improper, the "fruit of the poisonous tree" doctrine is not implicated. Moreover, even if the March 20th interrogation was improper, Ingerson did not establish that the issuance of the second search warrant on March 25, 2009, was in any way reliant on or derivative of information gleaned by law enforcement officers from prior discussions with Ingerson.

> [The Fifth Amendment] does not preclude a witness from
> testifying voluntarily in matters which may incriminate him, . . .
> for those competent and freewilled to do so may give evidence
> against the whole world, themselves included. . . . Indeed, far
> from being prohibited by the Constitution, admissions of guilt by
> wrongdoers, if not coerced, are inherently desirable.

*U.S. v. Washington*, 431 U.S. 181, 186-87, 97 S.Ct. 1814, 1818 (1977). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. U.S.*, 530 U.S. 428, 434, 120 S.Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness. The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S.Ct. at 2331; *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630 (1984). Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth
> Amendment privilege against self-incrimination, *Miranda* imposed
> on the police an obligation to follow certain procedures in their
> dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S.Ct. at 1624-26.

6

With regard to the March 20th questioning of Ingerson, it is undisputed that Ingerson was not advised of his rights under *Miranda*. Such a fact, however, does not necessarily render any statements made by Ingerson admissible. It is well settled that "police officers are not required to administer *Miranda* warnings to everyone whom they question." *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (*en banc*) (*quoting Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Rather, the protections of *Miranda* apply only to custodial interrogations. *United States v. Black Bear*, 422 F.3d 658, 661 (8th Cir. 2005); *Miranda*, 384 U.S. at 444, (1966); *Minnesota v. Murphy*, 465 U.S. 420, 430, (1984).

A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." *Maine v. Thibodeau*, 475 U.S. 1144, 1146 (1986) (*quoting Miranda*, 384 U.S. at 444). Consequently, "[t]he ultimate inquiry to determine custody for *Miranda* purposes is whether there was a formal arrest, or restraint on freedom of movement of the degree associated with a formal arrest." *Black Bear*, 422 F.3d at 661. In making this determination, the Court first considers the totality of the circumstances confronting Ingerson and then determines whether a reasonable person in Ingerson's position would consider his "freedom of movement restricted to the degree associated with formal arrest." *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004). Such a determination is "based on the objective circumstances, not on subjective views of the participants." *Black Bear*, 422 F.3d at 661. *See also LeBrun*, 363 F.3d at 720.

The Eighth Circuit has identified several factors that are indicative of custody, including: (1) whether the suspect was informed that he was free to leave and that answering questioning was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect

7

initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or, (6) whether the suspect was placed under arrest at the end of questioning. *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). The Eighth Circuit, however, has emphasized that these factors are not exclusive, and custody "cannot be resolved merely be counting up the number of factors on each side of the balance and rendering a decision accordingly." *Czichray*, 378 F.3d at 827.

Turning to the factual evidence before the Court,[2] there is little support for Ingerson's contention that he was in custody on March 20.[3] Ingerson was explicitly told by Special Agent Kanatzar that he was free to leave and that he did not have to talk with the officers. Ingerson's freedom of movement was not restricted or impeded. No strong arm tactics or deceptive or coercive measures were used against Ingerson. Nor was Ingerson arrested on March 20, 2009. It is true that Ingerson did not initiate the contact. It is also true that there were seven law enforcement officers executing the search warrant on March 20, however, the actual questioning of Ingerson was only conducted by two of the officers (with Special Agent Kanatzar primarily handling nearly all of the interrogation). While police were at the scene, the atmosphere was not objectively police-dominated. Under these facts, the Court concludes that Ingerson was not in custody, the apprisal of his *Miranda* rights was not required, and the statements he made to law enforcement on March 20, 2009, were voluntary.

---

[2] It should be reiterated that the only testimonial evidence presented to the Court was the sworn testimony of Special Agent Kanatzar.

[3] The parties do not dispute (and there seems little question) that Ingerson was subject to an interrogation on March 20, 2009.

8

The issue surrounding the interrogation of Ingerson on March 25, 2009, are somewhat different. On that date, Ingerson was placed in custody and questioned. However, on that date, Ingerson was also advised of his *Miranda* rights. After being informed of his rights, Ingerson elected to talk with law enforcement officers.

Despite the inherently coercive nature of custodial interrogations, it is well settled that a criminal suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1628. However, "[a] waiver of *Miranda* rights is invalid if, in the totality of the circumstances, the accused's will was overborne." *United States v. Holloway*, 128 F.3d 1254 (8th Cir.1997) (*citing United States v. Makes Room*, 49 F.3d 410, 414 (8th Cir.1995)); *see also United States v. Caldwell*, 954 F.2d 496, 505 (8th Cir.1992) (waiver of *Miranda* rights is determined under totality of the circumstances and in light of the entire course of police conduct).

In *United States v. Boyd*, 180 F.3d 967 (8th Cir.1999), the Eighth Circuit explained how to determine whether a waiver of *Miranda* rights is valid:

> The determination of whether an accused has knowingly and voluntarily waived his *Miranda* rights depends on all the facts of each particular case. The circumstances include the background, experience, and conduct of the accused. The government has the burden of proving that the defendant voluntarily and knowingly waived his rights.

*Id.* at 977 (*internal citations omitted*); *see also United States v. Barahona*, 990 F.2d 412, 418 (8th Cir.1993) (government bears burden of proving by preponderance of evidence that defendant knowingly, voluntarily, and intelligently waived his rights).

Thus, an inquiry into whether a suspect's *Miranda* rights have been waived "has two distinct dimensions." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. The Court has explained:

9

> First, the relinquishment of the right must have been voluntary in
> the sense that it was the product of a free and deliberate choice
> rather than intimidation, coercion, or deception. Second, the
> waiver must have been made with a full awareness of both the
> nature of the right being abandoned and the consequences of the
> decision to abandon it.

*Id.* at 421, 106 S.Ct. at 1141. The *Moran* court further noted that "[o]nly if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (*quoting Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2571 (1979)). These principles subsequently have been summarized by lower courts. For instance in *Holman v. Kemna*, 212 F.3d 413 (8th Cir.2000), the Eighth Circuit found:

> A waiver is voluntary if it is the product of a free and deliberate
> choice rather than intimidation, coercion, or deception. A waiver is
> knowing and intelligent if it has been made with a full awareness
> of both the nature of the right being abandoned and the
> consequences of the decision to abandon it.

*Id.* at 420.

In reviewing the totality of the circumstances surrounding the statements made by Ingerson to law enforcement officers on March 25, 2009, the Court concludes that the statements were made voluntarily and the statements were made after a voluntary, knowing and intelligent waiver of Ingerson's *Miranda* rights. In this regard, the credible testimony of Special Agent Kanatzar more than satisfies the government's burden of proof.

Particular mention however, is made to the claim that Ingerson's waiver of his rights was not knowing and voluntary based on the fact that he had taken a sleeping aid medication at some unknown time before the officers arrived at his home. The Eighth Circuit has emphasized that the fact that a suspect is under the influence of drugs (or is intoxicated) is but a mere factor to be considered in the totality of circumstances. In its early key decision in *United States v. Harden*,

10

480 F.2d 646 (8th Cir. 1973), the Eighth Circuit considered the admissibility of a confession given by a suspect who (with the cooperation of the police) was administered a half-dosage of Demerol to combat withdrawal symptoms.  In determining that the suspect's ensuing statements were admissible at trial, the Court held:

> [T]here is no indication that [the suspect's] statements were not the product of a rational intellect and free will.  We are not prepared to say that a confession made by a person under the influence of drugs is *per se* involuntary.

*Id*. at 651; *see also United States v. Korn*, 138 F.3d 1239, 1240 (8th Cir. 1998) (*Miranda* waiver was voluntary despite a suspect's claim that "he was under the influence of drugs and was exhausted"); *United States v. Turner*, 157 F.3d 552, 555 (8th Cir.1998) (*Miranda* waiver was voluntary despite a suspect's claims that he had a low IQ, was intoxicated by PCP, and suffered from a mental illness at the time of the police interrogation).

This reasoning in this line of cases was reaffirmed by the Eighth Circuit in *United States v. Annis*, 446 F.3d 852 (8th Cir. 2006).  In *Annis*, the defendant attempted to suppress incriminating statements made to law enforcement officers because "the pain from his injuries, combined with methamphetamine withdrawal, made it impossible for him to voluntarily and knowingly waive his rights at the time of the interview."  *Id*. at 856.  The Court affirmed the defendant's conviction, noting:

> This court . . . has declined to adopt a per se rule of involuntariness founded solely on intoxication.  Instead, the test is whether these mental impairments caused the defendant's will to be overborne. [The defendant] provided no evidence that his pain and meth withdrawal caused his will to be overborne. To the contrary, the government proved that during the interview [the defendant] answered questions reasonably, even reading and reviewing his statements twice and signing the report. He did not appear to be in any pain or suffering from withdrawal, and did not complain to [the interviewing officer]. There is no evidence of police coercion

11

> overbearing his will. Thus, his waiver, as well as his statement,
> were both knowing and voluntary.

*Id.*

Similarly, in this case, there is no evidence that Ingerson's use of Ambien caused his will to be overborne. Instead, there is the unrefuted evidence from Special Agent Kanatzar that Ingerson appeared able to understand what was happening, comprehend the questions being asked of him, and cogently and coherently respond to the questions. As such, the totality of the circumstances and the credible evidence demonstrates to the Court that Ingerson's statements were "the product of a rational intellect and free will" and there is no indication that drug use or exhaustion caused Ingerson's will to be overborne.

For the foregoing reasons, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE (Doc. #17) filed July 29, 2009 by defendant Terry Ingerson.

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

            */s/ John T. Maughmer*
            **John T. Maughmer**
            **United States Magistrate Judge**